This is appeal number 18-3134, Chicago Studio Rental and others v. the Illinois Department of Commerce and other defendants. I believe we'll hear first from Mr. DelMedico. Mr. DelMedico, may it please the court, my name is Frank DelMedico, I'm the attorney for the plaintiff appellants in this matter. I'm going to refer to my clients as CSE throughout. My clients contend and believe that this particular case involves questions of exceptional importance in the areas of antitrust litigation as well as equal protection. In short, when does anti-competitive conduct by state actors violate antitrust and equal protection laws and under the equal protection laws of the class of one? As a way of a background, I'd like to present some salient facts to the court. My client, CSE, has existed in the film industry since 1979 to present. They were profitable up until about 2009. They filmed many different movies in the Chicago area and were a catalyst for the industry. Cinespace is a Canadian film studio based out of Toronto and it located to Illinois in or about 2009 and it became operational in mid-2011. In the process from 2009 to 2014, Cinespace received $27.3 million of grant funds from the state of Illinois, $10 million of which was returned when Governor Rauner took office. In the eve of leaving office, Governor Quinn just issued a $10 million check to Cinespace and Governor Rauner called that back. Mr. Chairman, forgive me for interrupting you, but I'd kind of like to get to the heart of something because the plaintiffs contend both that the defendants are not competitors of the plaintiffs, but that the defendants are market participants. Now what I am trying to understand is how could both of those things be true? In other words, how can you be a market participant and not be incompetent? When we made the allegation of a market participant, the way we viewed it, Your Honor, is insofar as the Illinois Film Office. The Illinois Film Office was charged with the responsibility of administering the film production tax credit. However, it went beyond that. It went into marketing and promoting Cinespace to the film industry executives and producers and directors. We contend that that made the Illinois Film Office a market participant because it was now steering business, film productions, to Cinespace and strictly to Cinespace. But they're not competitors? Have you changed your view on that? They are not competitors. I mean, the Illinois Film Office and my client are not competitors. But isn't that something you've alleged? Did I miss something? If it's alleged that way, it's not proper. We were saying we're competitors with Cinespace. We're not competitors with the Illinois Film Office, but we are saying that the Illinois Film Office was a market participant when it began to market for Cinespace. When it started, for example, there is an email at one point in time from the Illinois Film Office wherein they're contacting Fox executives on the movie Empire and producing tons of visual and soliciting the business on behalf of Cinespace. Therefore, we contend the Illinois Film Office became quasi-market participant. Quasi? Yes, I would—well, a market participant. Let me strike quasi. Okay. Well, does the Illinois Film Office provide studio space for its contradictors? It does not. It recommends it. This situation seems very different from a state bar association that's run by working lawyers or a state dental licensing board run by practicing dentists. This is a state agency run by state employees who are not participating in the market, it would seem to me, except as directed by state law. In so far as state law, there is no law which directs the Illinois Film Office to become a marketing department or a promoter of one entity over the other. It's supposed to do it equally and fairly. With regard to the— How have you—I totally understand from reading your amended complaint that as a plaintiff and as a competitor of Cinespace, you very much feel you've been injured as a competitor. But isn't the inquiry for antitrust injury, whether there's been an injury to competition in the market? Yes. And that's where it would really help me if you could focus on how you've adequately pled injury to competition. In the amended complaint in paragraph 65 through paragraphs 68A through E, overall output was reduced, is one of our contentions. With regard to— But how is output reduced plausibly alleged here? When you're talking—you have other allegations that talk about the increase in the film production in Chicago because of Cinespace. So how can you plausibly say that output in the industry or in the market has been reduced given those other allegations? Well, our contention is that the output was reduced because it was just focused in one area, Cinespace. My client, CSE, wasn't operating at a profit, wasn't receiving any of the film production. But your clients, to go to Judge Scudder's point, it doesn't matter for an antitrust injury. If your client's individual output was produced, there has to be a market injury. What are your allegations that support an antitrust injury or a market injury, an injury to competition here? Well, we do cite to over-end as well as a new court case where, specifically, and to competition in and of itself, that injury translates to an injury to the entire market. But it seems very odd to argue that competition or output were reduced when, in fact, the state went from one production facility to two production facilities. And it seems odd to argue that the introduction of competition somehow hurt consumers when, in fact, the film business for Illinois increased. So what are your allegations that would support competition being harmed here? First and foremost, that there was a monopoly created, and that monopoly controlled and dominated the market, the film industry market. And it didn't allow for other entities to enter into the market at the same time. Are you saying that if a third company wanted to come into Illinois, they couldn't? I don't understand the last point at all. I'm not saying that if a third company came in, they couldn't. I think that they would be, how would I want to phrase this? They would be susceptible to the same anti-competitive results and effects that occurred to my client when all the business was being steered to Cinespace by the Illinois Film Office. And there's no allegation here that your client was excluded from the market? I would say it's an inference that can be drawn based on the steering, promoting, and marketing of Cinespace by the Illinois Film Office. Did the plan apply for grants that were awarded to Cinespace? I'm sorry, Your Honor, could you repeat that? Did your clients, your client apply for grants that were awarded to Cinespace? My client did, I couldn't tell you that, but I could tell you that my client did in fact apply for grants. And when they applied for grants... Were they awarded to Cinespace? That I do not know. But you haven't alleged that, at a minimum you haven't alleged that, right? Separate and apart from the factual, what the answer is, as a matter of fact, it's not alleged. Correct. And did your client ever reach out for help like Cinespace did? You allege Cinespace asked for help with respect to connections and introductions to the producers. Do you allege anywhere that you ever sought such help and were turned down? No, we do not allege that in a complaint. We do not. But, well, I'm not going to... I'm sorry? I was going to say, but through discovery, I mean, it came out that my clients did apply for a grant. But we're talking about motion to dismiss. Correct. And what's alleged there. I didn't see any allegations that your client, unlike Cinespace, actually reached out and asked for help and was ever turned down. That is correct. There's no allegations of that. So what's the anti-competitive conduct at issue here? The conduct that we contend is anti-competitive is, one, the awarding of the grants is fine. They can... That's all right. We get that. So you're not contesting the awarding of the grants or the tax credit, I would assume. No, I would not say that. But what I would say, the anti-competitive conduct is... So I'm sorry. I just want to make... I may have asked you a double negative. Are you challenging the awarding of tax credits as anti-competitive conduct? No. Because the tax credits really do not affect the film studios. I agree. They benefit the production companies that come in here to film. I agree. So what is the anti-competitive conduct that you're challenging here? The anti-competitive conduct, again, I'm going to go back to it, is the Illinois Film Office directing, steering producers, film executives to cine space over CSC when it should have been neutral. Both entities should have been disclosed to the potential producers, directors, and executives. How has your analysis impacted, given your allegations, that cine space actually reached out and asked for help and introductions and your client never did? Well, first and foremost, it's not within the realm of the Illinois Film Office to be providing that information or marketing cine space. Where do you get that? How could... Because Illinois... What is that statement based on? The Illinois Film Office is charged strictly with administering the Illinois Film Production Tax Credit. I was there for the beginning of that, forgive me, but what Judge St. Eve was just talking about is the absolute function of the Illinois Film Office. They are supposed to bring films to Illinois. I would agree with your honor, but in so doing, they should be promoting both cine space as well as CSC. And not just simply... I mean, once the grant funds... Our position is once the grant funds, $17.3 million was provided to cine space, it became... The Illinois Film Office is not... It's not my responsibility to direct the producer's executives to cine space. At the same time, it should have been done for both, whether or not my client received any grant funds. So it's your position that it somehow violates the antitrust laws because cine space reached out for help and they got it and you didn't get help because you didn't ask, that that somehow violates the antitrust laws? I wouldn't phrase it that way, but this is kind of how I encapsulate our complaint and the allegations within it. You have the Illinois Film Office and it's strictly charged with the responsibility of administering the tax credit. With that said, the point of contact for all executives is the Illinois Film Office and the managing director, Ms. Steinberg. In so doing, Ms. Steinberg began a process, even though they reached out, Ms. Steinberg should at the same time have had both film studios in her purview and she didn't. She was marketing on behalf of cine space solely. That's the anti-competitive conduct that we allege violates the antitrust law. Okay. Do you want to save a minute for rebuttal? Please. Okay. Mr. Jacobson, I believe. Thank you, Your Honor. Assistant Attorney General Ben Jacobson on behalf of Defendants Advocates. As Your Honors noted, the core contentions here don't allege an antitrust injury and the request of CSC to apply the North Carolina State Board test here makes no sense. Would you, Mr. Jacobson, with respect to the test that would apply for purposes of immunity, do you agree that the district court did not apply the correct test? Yes, Your Honor, but that it's not reversible error here. It's just a noble review. This court can affirm on any basis in the record and support it by the law and here there's two reasons that the court reached the right decision even if it didn't go there by the correct process. First is that the concerns that the court looked to in the Tchaikovsky test are the same that underlie all three of the Parker immunity tests. The court is supposed to look for whether or not the actor in question is a purely public actor or a private actor who runs the risk of abusing the delegated authority to benefit their own interests. And then... Are you saying that the factors that were applied are the same as what was applied in Parker or the same that we would look at through any of the three tests that are before the court? They're not the exact same factors, Your Honor, but the concerns that are within those factors are the same concerns that underlie all of the Parker analysis. The four Tchaikovsky factors are looking to see if it's a public actor, if the conduct was authorized by the legislature, if the actor was the state itself or a sub-state entity, and if the challenge program was enacted for the public good or for private financial gain. And so, with Parker analysis, that first automatic immunity, the idea is that if it's a state sovereign actor, you don't need to look behind the curtain because then it's presumed that they're acting for the public interest. And then with the second and third tiers, the delineation between them, between that Howey and the Mid-Cal North Carolina State Board test, is whether or not the actor in the market who has engagement with that market outside of the public role, which are the same concerns that underlie those four Tchaikovsky factors. But then beyond that, here, defendants at Belize were entitled to state action immunity either automatically as sovereign state actors or under the second tier Howey test. As this court held in Fuchs, the director of a full-fledged state agency is entitled to automatic immunity. Why wouldn't that control here, as opposed to Parker, given this court's holding in Fuchs? I believe it would hold here, Your Honor. Okay. So you think, I read your brief as saying Parker immunity applies. It sounds as if you're saying that, or agreeing that Howey immunity may apply instead. From the way that I read Fuchs, Your Honor, is that with respect to the state agency at issue there, they were applying the automatic immunity, that automatic Parker immunity, the same as in Parker itself. Now the- I'm not sure I would read it the same way. But you think, regardless, Fuchs has some control here, would you agree? Yes. Yes, Your Honor. I would agree with that. The Supreme Court has not explicitly ruled on whether or not executive branch agencies receive automatic immunity, which tier they fall under. But the way that I understand Fuchs is that this court has already held that the heads of offices do, but then as well, the First and the Ninth Circuits have both held that full-fledged executive departments receive that automatic immunity. Because they are full-time state actors, we're not looking at whether or not it's an actor only for certain purposes, and that's where Howey and North Carolina State Board come into play. Howey, you have a municipality that's been delegated state authority to conduct conduct in certain instances on behalf of the state, and the same with private actors. I just wanted to respond quickly to the active market participant question here. I think that the way that CSC is asking this court to interpret active market participants is a misunderstanding of the law. The concern is whether the—what the case looks—what the court looks to is whether the actors in question have that private engagement outside of the public role, again, coming back to that state agency only for limited purposes. It's not that by engaging with the market through the actor's public role that they then become a market participant. Otherwise, the North Carolina State Board test would swallow the whole pool, and all Does the Howey intermediate immunity only apply if the legislature intended to displace competition in the program that's at issue? It's not if they explicitly intended. They don't have to explicitly say— Explicit or implicit. Does that have to be a goal? I think the language is whether it's foreseeable, and I think that, I guess, it would be an intention that they must have at least intended not—intended to preclude anti-competitive conduct because the anti-competitive results were foreseeable. And is that something we can say applies here, given what the legislature said when it created this agency, that it wanted to bolster the film industry in Chicago and make it more robust? Yes, Your Honor. Is that consistent with an implicit intent to displace competition or a foreseeable result of displacing competition? At least within this context here, Your Honor. How would that work? It seems like it's more to encourage competition. So there's kind of two, I think, two elements to this, the first of which is if you look at the allegations in their complaint, and this comes to what Your Honors were discussing earlier, there is actually really an allegation of an increase in competition. And so there's a question about whether or not the conduct here is actually anti-competitive at all. And that, I agree, would go to the next question or the next issue of antitrust entry. But I'm on the immunity question and the test that would apply under Halley. And trying to find how you can reconcile one aspect of the Halley test is, is there—is it foreseeable or was it an express intent to displace competition with what the legislature was doing here when it created the agency, which seemed to be to encourage competition to do what it could to grow this industry? Are those two compatible? Yes, Your Honor. How? Because to promote and grow the industry does not necessarily mean to promote and grow competition in all instances. That may be true, but take it to the next step. How would it be foreseeable that it would be displacing competition? It would be foreseeable in the sense of, as you have—as is alleged here, that the director of the office, Director Steinberg, would be promoting the newer, more state-of-the-art facility and using that as the pull to bring producers to Illinois to increase business and jobs and the market here in Illinois. But you're not agreeing that those allegations amount to actually replacing or displacing competition? No, no, Your Honor. Here CSE failed to allege an antitrust injury. They failed to allege that there was a reduction in production or an increase in prices or under that narrow definition for exclusion from the market, which requires complete exclusion. There's no allegations in the complaint that any of those injuries occurred, and in fact, as Your Honor pointed out, the complaint alleges an increase on pages 12 to 13 of the complaint. It states that there were record numbers in 2012 and that there was almost twice as much revenue from movies in Illinois in 2013. So following the entry of Cinespace into the market, there was actually an increase in competition and an increase in revenue in the market. And as I believe in Trigen, this court stated that where there's been an allegation of an increase in competition in the market, that fails to allege an antitrust injury. But I thought your adversary was saying, I don't know that I would characterize that as an increase in competition because at least as alleged, Cinespace had 90% of the market. So I thought that one way to read the complaint possibly, I know you'll disagree with this and you can address it, is that there really was kind of functional exclusion here through the steering and different practices like that. In other words, those actions resulted in Cinespace acquiring 90% of the market. CSC's drops down to presumably 10. There's no discussion of others in this particular space. And I don't know how you say that increases competition. Reading the complaints as a whole, your honor, the CSC has alleged that they, prior to Cinespace's entry into the market, they were the only big actor here. So Cinespace's entry into the market was a huge increase in competition. It was the only competition that this market has seen during CSC's existence. And so that in and of itself is an increase in competition. And then for the purposes of exclusion, exclusion under Trigen requires complete exclusion from the market because the purpose of the antitrust laws is to protect competition itself and not competitors. And so while normally plaintiffs are going to have to allege under the reduction in production or increase in prices to consumers, and it's only when they've been completely excluded that you can show a true injury to competition. So your point is that a new competitor entered and that new competitor, if I understand the briefing right, brought massive new capacity to the market, right, as far as square footage and opportunity for more filming and producing within the state of Illinois. And that added capacity to the market is what accounts for the growth and production revenue over this period of time. Yes, Your Honor, that's exactly right. And I think the closest that the complaint comes to alleging that there was the required increase in prices to consumer or reduction in output is a bare conclusory allegation. And under the Supreme Court's decision in Twombly and this court's decision in McCauley, in the complex context of antitrust litigation, more specificity is required in that. And unless Your Honors have any further questions, we would rest on our briefs for the remainder of the issues. Thank you, and we request that you affirm the district court's decision. Okay, thank you, Mr. Jacobson. Mr. DelMedico, you have a minute left. Briefly, Your Honor, in touching upon the statutory mechanism that allowed the Illinois Film Office and DECO to displace competition, there is no statute on point which specifically identifies or states that competition can be removed in all essence. What we contend to is that there's no statute that clearly articulates and affirmatively expresses such. They cannot point to one. In fact, if we look at— Does it have to expressly state it, though? Can't it just be foreseeable, as counsel pointed out? I'd say it has to be under the Fobey-Putney case. It has to be inherently anti-competitive, and I see no language within the statute to that effect. In fact, if we look at an aspect of DECO, the statute, 20 ILCS 605-605-335, dealing specifically with industrial manufacturing enterprises, it looks and it states that when they're looking to bring in a foreign entity such as Cinespace and fund it with grant money, there should be a look at the effect on the local and regional competition. It also states that the degree of economic benefits and awarding those benefits to the same entity should be looked at as well. I think that's guidance here, that this statute is not intended to displace competition. Okay. Thank you. Thanks to both counsel. The case is submitted, and we'll take our short recess now.